**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:09cv15**

| | | |
|---|---|---|
| BSN MEDICAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | **AMENDED MEMORANDUM** |
| | ) | **OF DECISION AND ORDER**[1] |
| PARKER MEDICAL ASSOCIATES LLC, | ) | |
| and A. BRUCE PARKER, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## I.    Background

This matter is before the court on the following motions by the parties: (1) a motion for summary judgment as to all of plaintiff's claims by defendants Bruce Parker and Parker Medical Associates, LLC (docket #234); a motion for partial summary judgment by plaintiff BSN Medical, Inc. as to defendants' counterclaims (docket #248); plaintiff's Motion to Strike the Declarations of Rich Hedderman, Larry VanAlstine, and Tim Porter (docket #274); and a motion to strike Section F of defendants' brief in response to plaintiff's Objections to the Declarations of Rich Hedderman, Larry VanAlstine, and Tim Porter (docket #290). The motions are ripe for disposition. Furthermore, on October 5, 2011, the court held a hearing on the respective summary judgment motions.

---

[1] Portions of the court's prior Order have been redacted to protect sensitive business information. The redaction does not impact the court's decision.

## II.    Facts[2]

This is essentially an action for, among other things, violation of trade secrets in which the plaintiff contends that defendant Bruce Parker, inventor of "Ortho-Glass," and Parker's company Parker Medical Associates ("PMA") are violating plaintiff's trade secrets by using the processes for manufacturing splints owned by plaintiff.  BSN has sued Bruce Parker and PMA, bringing the following claims: copyright infringement under the federal Copyright Act, 17 U.S.C. § 101 et seq.; threatened or actual misappropriation of trade secrets under the North Carolina Trade Secrets Protection Act, N.C. GEN. STAT. § 66-152 et seq.; breach of contract; violations of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. GEN. STAT. § 75-1.1 et seq.; false advertising and unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a) et seq.; and tortious interference with actual and/or prospective economic advantage under North Carolina common law.[3]  Defendants have filed counterclaims against plaintiff for false advertising and unfair competition under the Lanham Act, and for unfair and deceptive trade practices.  On July 22, 2011, defendants filed a motion for summary judgment as to all of plaintiff's claims.  Also on July 22, 2011, plaintiff filed a motion for partial summary judgment as to plaintiff's claim for breach of employment

---

[2]  In support of the respective motions for summary judgment, the parties have filed hundreds of pages of exhibits, with a multitude of record cites.  The court will not provide each and every record cite in the court's Order, particularly where a factual issue is either undisputed or is not dispositive of the summary judgment motions.  As always, the facts in this case will be taken in the light most favorable to the nonmovant for each parties' respective summary judgment motions, and the court will indicate where a factual issue is disputed.

[3]  The court will not repeat here the procedural history leading to the pending motions, as the parties and the court are all by now intimately familiar with this case.

2

agreement against Bruce Parker, and as to defendants' counterclaims for false advertising/unfair competition under the Lanham Act and for unfair and deceptive trade practices. These motions are pending before the court.

**A.    Facts Relevant to Plaintiff's Claims Against Defendants for Misappropriation of Trade Secrets, False Advertising/Unfair Competition under the Lanham Act, Unfair and Deceptive Trade Practices, Tortious Interference with Prospective Economic Advantage, and Breach of Contract**

**1.  Defendant Bruce Parker Develops Casting and Splinting Products While at Zimmer**

Defendant A. Bruce Parker is a chemist and an inventor. As a former analytical chemist at Reeves Brothers, Inc., Parker analyzed polyurethanes and textiles, including fiberglass, and regularly experimented with impregnating or coating textiles with polyurethanes. In the late 1970s, Parker honed his fiberglass/resin skills by building a sailboat. Between 1982 and 1986, Parker developed casting and splinting products for Zimmer, Inc.

Before the 1970s, most casts and splints were made from plaster-coated cloth. In the 1970s, polyurethane-coated fiberglass casts were introduced as lighter, stronger, and cleaner than plaster-coated cloth. While at Zimmer, Parker and others developed synthetic fiberglass casts using polyurethane resin rather than plaster. Zimmer used a procedure that defendants refer to as "dosing and wicking" in order to coat the fiberglass substrates with polyurethane resin. Plaintiff, on the other hand, describes the procedure as a "Coating Trade Secret," or

3

CTS.

### 2. Defendant Bruce Parker Leaves Zimmer and Creates PMA

In the 1980s, Parker left Zimmer and formed PMA in Charlotte, North Carolina.[4] While at PMA, Parker created a product called "Ortho-Glass." The Ortho-Glass product consists of a long roll of fiberglass substrate coated in a polyurethane resin, which is packaged in a foil sleeve, and which is then sealed at both ends to prevent contact with humid air. Parker created a specific "Ortho-Glass Process" to make Ortho-Glass splints. Furthermore, by using the dosing and wicking procedure when manufacturing Ortho-Glass, PMA developed a manufacturing process specifically controlled for important variables such as substrate configuration, resin formulation, resin percentage, application method, humidity control, curing container, immersion time, curing temperature, and other elements necessary to successfully manufacture Ortho-Glass. As part of the Ortho-Glass Process, PMA also used a method, described as either the "Foil Method," or the "Foil Insertion Method," in which an Ortho-Glass product encases the Ortho-Glass substrate (which is wrapped in padding for application to the end user) in foil. Plaintiff contends that the Foil Insertion Method is a trade secret; defendants contend it is not.

While at PMA, Parker also invented a new, synthetic splint roll packaging system for the Ortho-Glass product, in which only the desired length of splint was used, while the remainder could be re-sealed. Parker patented the packaging system for Ortho-Glass. It is

---

[4] The entity originally formed by Parker was Parker Medical Associates, LP ("PMALP"). In December 2006, PMALP converted to Parker Medical Associates, LLC ("PMA"). For simplicity, the court will simply refer to both Parker entities as PMA.

4

undisputed that, while the *packaging* system was protected by patent, the *manufacturing* process for Ortho-Glass was not patented.

### 3. Defendant PMA Sells Certain Assets in its Splinting Business to Smith & Nephew Casting, Inc. Pursuant to an Asset Purchase Agreement

In 1996, PMA sold certain assets of its synthetic splinting business to Smith & Nephew Casting, Inc. ("Smith & Nephew") pursuant to an Asset Purchase Agreement ("APA"). The purchase price for the sale of PMA's assets was $44 million. As part of the APA, Smith & Nephew expressly purchased certain intellectual property, including "[a]ll Trade Secrets and other proprietary or confidential information used primarily in connection with the Splinting Business." The parties defined the term "Trade Secrets" to include "the process used to apply polyurethane resins or other coatings to substrates and method used to insert the Ortho-Glass product into the foil sleeve." (Schedule 5.15 to the APA, p. 27 Td17 Tab 2.) As part of the APA, PMA also sold the existing patents on the Ortho-Glass packaging system to Smith & Nephew, including six U.S. patents, two U.S. patent applications, one non-U.S. patent, and two pending non-U.S. patent applications.[5]

### 4. The Employment and Licensing Agreements

As part of the APA, Bruce Parker entered into an Employment Agreement with Smith & Nephew, under which Parker agreed to serve as Smith & Nephew's President for three years. The APA and the Employment Agreement had a six-year covenant not to compete,

---

[5] The purchase specifically excluded PMA's smaller division known as Parker Athletics, which sold custom-fit shinguards, as well as PMA's holdings in Reprogenesis, Inc.

5

after which time defendants were allowed to compete using the Parker Medical name and sell the same products as long as Parker did not use "Confidential Information" or infringe the patents. (APA § 8.1, p. 43; Emp. Agmt. § 6(b), p. 5; Darcey 60:9-63:12, 71:7-75:4, 99:13-100:9.) The Employment Agreement defined "Confidential Information" as "information, observations and data obtained by [Parker] while employed by the Company pursuant to this Agreement, as well as those obtained by [Parker] while employed by the Company . . . prior to the date of this Agreement, concerning the business or affairs of the Company or any of its subsidiaries or affiliates or any predecessor thereof[.]" The Employment Agreement specifically stated that certain information was *not* confidential and was fully available for Parker to use:

> (i) information or data that is or becomes generally known within the industry to which [Smith & Nephew] belongs other than as a result of the Employee's acts or omissions to act, (ii) information or data which the Employee can demonstrate to be known by the Employee prior to Employee's employment with Parker.

(Emp. Agmt. ¶ 5, p. 4.)

Furthermore, upon execution of the APA, PMA entered into a License Agreement with Smith & Nephew. The license agreement specifically allowed PMA to continue using the Ortho-Glass manufacturing process to make athletic products for Parker Athletic, a separate company owned by Bruce Parker that did not make the medical splints. Paragraph 2.1(a) of the License Agreement states "S & N hereby grants, and Parker Medical hereby accepts, a nonexclusive, non-transferable, personal royalty-free right and license to: use any of the Know-How solely to manufacture in the United States custom formed devices

designed and promoted for the mechanical protection of the body from contact sporting injures." (Td 17, Tab 3, Tab 4.) The License Agreement specifically defines "Know-How" as "the process used to apply polyurethane resins or other coatings to substrates." (*Id.*) Thus, under the License Agreement, PMA was allowed to use the Ortho-Glass Process *solely* for the purpose of making PMA's athletic products.

### 5. Smith & Nephew's Due Diligence Before Entering Into the APA and Defendants' Disclosures to Smith & Nephew Regarding the Dosing and Wicking Procedure

Smith & Nephew conducted due diligence for close to a year before the APA was executed. In the APA, defendants represented that the Trade Secrets (*i.e.*, the Ortho-Glass Process and the Foil Method) were developed by PMA. (APA § 5.15(d), p. 27.) According to defendants, during due diligence, Parker specifically informed Smith & Nephew that he knew dosing and wicking *before* his employment with PMA. (Parker Decl. ¶ 37; Parker3 48:7-25; July 7, 2011 Parker Dep. ("Parker 5") 156:1-158:2.) Bob Lucas, Smith & Nephew's principal in-house lawyer, testified that when the APA was signed, Smith & Nephew knew that Zimmer had used a process similar to PMA's, and that Zimmer was still using the same formula Parker created in the mid-80s: "Bruce Parker told me something about the fact that he has manufactured cast tape for Zimmer and that Zimmer is still using the same formula that Bruce had established in the mid 80s. [Steve Lang to follow-up on this.]" (Td17 Tab 6, p. 13 (Lucas Rep.); Lucas Dep. 5:6-10, 6:17-7:3, 52:8-15; 53:1-11, 163:17-164:13; 175:8-182:3.)

7

Steve Lang, Smith & Nephew's principal business negotiator, testified that "Smith and Nephew was aware that a dosing and wicking procedure had been previously used by Bruce Parker at Zimmer to make cast tape . . . ." (Lang Dec. ¶¶ 16, 2-11; Lang 8:8-9:17, 11:10-24, 118:7-18, 120:3-24, 121:21-123:18, 128:19-129:10, 209:15-210:22, 211:19-214:1, 233:20-234:5.) Lang described the following as "negative" factors in his due diligence report: "A similar process has been used by Zimmer in a different format. Zimmer no longer a major player–probably not a major negative. Can Smith & Nephew protect the process as well as Parker post acquisition. We will need to be as diligent and careful as he is." (Td17 Tab 5 ("Lang Rep.") p. 3; Lang 89:9-90:14.)

In the APA, defendants also represented that PMA took reasonable steps to maintain and protect the confidentiality of the Trade Secrets. (APA § 5.15(d), p. 27.) Defendants contend that, during due diligence, defendants disclosed exactly what efforts had and had not been taken. For example, Parker disclosed to Smith & Nephew that people who were not subject to confidentiality agreements had viewed the Ortho-Glass trade secrets. (Lucas 175:8-178:15, Lucas Rep. p. 13, ¶ 2.) According to defendants, Parker also told Smith & Nephew that he set up cast tape manufacturing facilities in Japan and in Mexico, where modified versions of the dosing and wicking procedure were used. (Parker Decl. ¶¶ 37-39; Lang 11:6-24, 216:10-219:25, 233:20-234:5, Lang Rep. pp. 3, 10 ¶ 4.3; Lucas 223:13-225:10.) Steve Lang testified that "[w]hat became evident [during due diligence was] that Dosing and Wicking as a *generic process* was known to others." (Lang 123:16-18; 166:3-167:14.)

8

Thad Adams, defendants' lawyers during the APA, testified he disclosed to Smith & Nephew that: "[Carolina Narrow Fabrics, PMA's vendor for the fiberglass substrates used in Ortho-Glass],[6] probably knows most if not all of the process." According to defendants, Adams' notes reflect that he made this statement, and he testified that "The things that I recorded in my notes . . . had been disclosed to Smith & Nephew." (Td17 Tab 9, Adams 4:16-5:17, 26:14-25, 30:12-18, 63:21-25-69:12, 189:14-190:20.)

It is undisputed that, during the due diligence process, defendants portrayed the Ortho-Glass manufacturing process as a trade secret. During the course of the negotiations between PMA and Smith & Nephew, defendants required Smith & Nephew to enter a blanket confidentiality agreement covering the basic exchange of information, but not PMA's manufacturing process. Defendants insisted that the manufacturing process be viewed only after a purchase price had been negotiated. Even then, PMA allowed only three people to view the manufacturing process. Furthermore, PMA required that none of these three people could be involved in Smith & Nephew's casting process, and the three people were forbidden from describing what they had seen with anyone else at Smith & Nephew. Defendants also required each of these three individuals to sign a personal confidentiality agreement. According to Steve Lang, defendants took these precautions because "the way in which they put the product together was not covered by the patents and they wished to keep that process secret." (Lang Tr. 53:18-25.)

---

[6] Carolina Narrow Fabric's principal, Horace Freeman, had visited PMA's plant in 1991 to fix a problem with Ortho-Glass. (Parker Decl. ¶ 29.)

Lang drafted a manufacturing due diligence report (the "Lang Report"), which referenced a "similar process" being used by Zimmer "in a different format." (Lang Rep. [DE 47-3].) Bob Lucas, Smith & Nephew's principal in-house counsel, followed up on this statement in his own report (the "Lucas Report") with Thad Adams, PMA's then-attorney, who offered numerous reasons to believe that defendants' manufacturing process had not been "adopted" from Zimmer. (Lucas Rep. [149-2] p. 13.) Additionally, Adams told Lucas that Bruce Parker had considered patenting PMA's manufacturing process, but had determined to keep it as a trade secret to extend its life span beyond that allowed by a patent. (*Id*.) The Lucas Report also included Parker's statements that some individuals had observed the process without being required to sign confidentiality agreements because those individuals would not understand the significance of the process, and Parker felt it would do more harm than good to highlight it in confidentiality agreements. (*Id*.)

6. **Parker Leaves Smith & Nephew, Plaintiff BSN Buys the Business from Smith & Nephew, BSN Changes the Ortho-Glass Process Before the Ortho-Glass Patents Expire, and PMA Re-enters the Splinting Business and Begins Competing with BSN**

In 2000, Parker ended his employment with Smith & Nephew. In 2001, plaintiff BSN purchased the business from Smith & Nephew under a "Business and Assets Transfer Agreement."[7] In anticipation of the expiration of the Ortho-Glass patents, BSN created a new, patented product, by changing from a seven-layer substrate to a single-layer substrate.

_____

[7] BSN was established as a joint venture between Beiersdorf AG and Smith & Nephew.

10

On March 31, 2003, defendants' covenants not to compete expired. In 2006, Bruce Parker decided to re-enter the splinting market. Furthermore, around that time, Parker Athletic Products, LLC ("Parker Athletic") began making precut splints for sale through a distribution company.

In January 2007, the last Ortho-Glass patent expired. After the last Ortho-Glass patent expired, PMA began manufacturing and selling fracture casting and seven-layer splinting products under the names "EZY SPLINT" and "PARKER SPLINT." Defendants contend that the new process does not use the Ortho-Glass Process, but is, instead, based on the non-confidential dosing and wicking procedure. According to defendants, PMA uses a different substrate, a different resin, a different weight of resin, different temperatures, different holding containers, and different rotation schedule, and has eliminated the need for humidity control. Plaintiff BSN contends, on the other hand, that the PMA process is so similar to BSN's process that it is essentially the same as the Ortho-Glass Process, or that the PMA process is clearly derived from the BSN process. Plaintiff contends, among other things, that in making the PMA splinting products, defendants are misappropriating BSN's trade secrets. Furthermore, plaintiff contends that defendants have been falsely marketing their product as "the original Ortho-Glass," therefore causing confusion in the marketplace.

**B.    Facts Relevant to Plaintiff's Claims Against Defendants for Copyright Infringement**

In 1997, Smith & Nephew registered U.S. copyright No. TX 00004517125 for the ORTHO-GLASS Splinting Manual, Second Edition (the "Splinting Manual"), a training

booklet provided to Smith & Nephew customers. Tom Darcey, Smith & Nephew's product manager, led the creation of the Splinting Manual and controlled the graphics, verbiage, and layout for the Manual. Darcey, Ken Hawkins, and graphic designer Nancy Roth collaborated to create the manual. Roth's contributions included all graphics, the layout of the work, and creating illustrations. According to Roth, her contributions to the layout of the work included making final decisions on its overall layout, including the placement of images, graphics, and text and how the overall work would be visually appealing to the end user.

The Splinting Manual provides illustrations and instructions for creating better splints, including guides to common splint types, "Preparation Guidelines" for the Ortho-Glass product, "Tips for Better Splinting," and other suggestions for using the Ortho-Glass product. Smith & Nephew, and later BSN, excerpted text and illustrations from the Splinting Manual to create portable a pocket chart (the "OG Pocket Chart"), which allows end users to carry the most pertinent information from the Splinting Manual with them at all times, including the "Preparation Guidelines," the "Tips for Better Splinting," and a list of common splints.

When PMA re-entered the splinting business, they created their own pocket chart (the "PMA Pocket Chart"). PMA's Pocket Chart has a Splinting Reference Chart on one side and Preparation Guidelines on the other. PMA hired Nancy Roth to create the PMA Pocket Chart. Plaintiff contends that the PMA Pocket chart was copied directly from the OG pocket chart and that defendants are therefore liable for copyright infringement.

C.     **Facts Relevant to Defendants' Counterclaims Against Plaintiff for False Advertising/Unfair Competition under the Lanham Act and Unfair and**

12

## Deceptive Trade Practices

As noted, defendants have filed counterclaims against plaintiff for false advertising/unfair competition under the Lanham Act and for unfair and deceptive trade practices. According to defendants, after PMA's re-entry into the synthetic splinting market, plaintiff developed a strategy to unlawfully thwart competition by making false statements about PMA and its products. Specifically, defendants contend that plaintiff began a false advertising campaign, claiming that seven-layer splints are subject to delamination and wrinkling. Plaintiff contends, in response, that its statements about delamination and wrinkling are true. In further support of their counterclaims, defendants contend that plaintiff's employees attempted to thwart competition by telling defendants' potential customers that plaintiff and defendants were involved in a lawsuit, which would result in defendants' inability to supply product, and that defendants would be out of business within a year. Defendants contend that this conduct constitutes Lanham Act violations as well as unfair and deceptive trade practices.

### III. Analysis

### A. Standard of Review on Summary Judgment

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997). The party seeking summary judgment bears the burden of initially coming forward and demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

13

(1986). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact-finder to return a verdict for that party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250 (1986); *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir. 1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim. *Celotex Corp.*, 477 U.S. at 331 (Brennan, J., dissenting). When making the summary judgment determination the court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997).

**B.      Discovery Issues**

**1.      Plaintiff's Objection to the Declarations of Rich Hedderman, Larry VanAlstine, and Timothy Bruce Porter (docket #274)**

Before addressing the merits of the respective summary judgment motions, the court will first address various discovery issues raised by the parties. First, the court notes that plaintiff BSN has objected to the Declarations of Rich Hedderman, Larry VanAlstine, and Timothy Bruce Porter, which were attached to defendants' brief in response to plaintiff's motion for summary judgment. Hedderman, VanAlstine, and Porter are all independent sales representatives for defendant PMA. The statements in the Declarations of Hedderman,

14

VanAlstine, and Porter all relate to statements allegedly made by BSN employees and/or sales representatives to potential customers of PMA. The Declarations attest that BSN employees told PMA's potential customers that BSN and PMA were involved in a lawsuit and that, because of the lawsuit, PMA would either not be able to fill supply orders, or that PMA would be out of business by the end of the year. BSN contends that each of the Declarations contains statements that are inadmissible, including hearsay and incompetent opinion testimony. BSN therefore requests that the court decline to consider the Declarations in addressing the parties' competing summary judgment motions.

Federal Rule of Civil Procedure 56(c)(4) provides that: "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). "When a party raises the issue of the admissibility of an opposing party's evidence in response to a motion for summary judgment, the court will disregard only the inadmissible portions of a challenged affidavit and consider the remainder." *Knight v. Vernon*, 23 F. Supp. 2d 634, 641 (M.D.N.C. 1998), *aff'd in part, rev'd in part on other grounds, and remanded*, 214 F.3d 544 (4th Cir. 2000).

### a.     Porter's Declaration

BSN first objects to paragraphs 4 and 7 through 9 of the Porter Declaration. In Porter's Declaration, Porter recounts that another sales representative named John Roisum told Porter that in mid-August 2010 Roisum made a sales presentation to Melvin Lund ("Lu"), the head Ortho Tech for Virginia Mason Medical Center ("VMMC") in Seattle,

15

Washington. (Porter Decl. ¶ 4.) VMMC subsequently approved the PMA splinting and casting products. According to Porter, Roisum told him that Lu submitted a request to the VMMC Value Analysis Committee for conversion from the 3M casting and splinting products to the Parker splinting and casting products. (*Id*. ¶ 7.) Roisum told Porter that later that month Lu was informed that the committee had approved the PMA splinting and casting products for use in the VMMC system. (*Id*.) Roisum told Porter that VMMC wished to purchase PMA splinting and casting products through Owens & Minor ("O&M"), VMMC's products distributor of choice. (*Id*. ¶ 8.)

Porter states in his Declaration: "Mr. Roisum told me that Lu had stated that BSN Medical Inc.'s ("BSN") local sales representative, Jennifer Jacoby, told VMMC's buyer, Lenore Rose, that Parker Medical and BSN were involved in a lawsuit. Ms. Jacoby also told Ms. Rose that Parker Medical 'would be out of business by the end of the year.'" (*Id*. ¶ 9.) The Porter Declaration states that because of Jacoby's statements about the lawsuit, PMA's customer VMMC "put the conversion to the Parker splinting and casting products on hold." (*Id*. ¶ 10.) Finally, Porter estimates in his Declaration that, from the product use information VMMC supplied, PMA expected that VMMC's annual purchases would be "well over $150,000." (*Id*. ¶ 11.)

Plaintiff contends that the above statements include inadmissible hearsay and speculative opinion testimony and would clearly be inadmissible if presented at trial. In response, defendants contend that none of the statements in the Porter Declaration are hearsay. Hearsay is a statement, other than one made by the declarant while testifying at the

16

trial or hearing, offered in evidence to prove the truth of the matter asserted. FED. R. EVID. 801. The court agrees with plaintiff that the Porter Declaration contains numerous inadmissible hearsay statements that the court cannot consider on summary judgment. That is, the Declaration contains a statement by an out-of-court declarant that is offered to prove the truth of the matter asserted–that a BSN employee told VMMC that PMA would be out of business within a year. Indeed, the statement in Paragraph 9 in which Porter contends that BSN employees told VMMC employees about the lawsuit between the parties, and which forms the crux of defendants' counterclaims for unfair competition and unfair and deceptive trade practices, contains several layers of hearsay. (*See* Porter Decl. ¶ 9, "Mr. Roisum *told* me that Lu *had stated* that [BSN's] local sales representative, Jennifer Jacoby, *told* VMMC's buyer, Lenore Rose, that Parker Medical and BSN were involved in a lawsuit. Ms. Jacoby also *told* Ms. Rose that Parker Medical 'would be out of business by the end of the year.'")

The court further finds that, although other statements in the Porter Declaration are not hearsay, they are simply not relevant to defendants' counterclaims separate and apart from the accompanying inadmissible hearsay statements. That is, the Porter Declaration was offered to support defendants' counterclaims against plaintiff for unfair competition and unfair and deceptive trade practices. To support these claims, defendants contend that BSN told potential customers of defendant PMA that the parties were involved in this lawsuit and that, as a result, defendant PMA would soon be out of business and would be unable to supply products. Without this statement, the remaining statements in the Porter Declaration–*i.e.*, Porter's statement regarding the amount in defendants' lost sales as a result

17

of BSN's alleged statements regarding this lawsuit–add nothing to defendants' counterclaims for unfair competition and unfair and deceptive trade practices. Therefore, the court will not consider the Porter Declaration in addressing the motions for summary judgment.

### b.    VanAlstine's Declaration

Plaintiff BSN also objects to Paragraphs 4 through 7 of the VanAlstine Declaration. In VanAlstine's Declaration, VanAlstine recounts that after PMA was awarded a purchasing contract by Premier (a buying group), VanAlstine approached the purchasing arm of McLeod Medical Center in Florence, South Carolina, to offer a cost-saving proposal. (VanAlstine Decl. ¶ 4.) McLeod employee Jamie Guy expressed an interest in the proposal, subject to review by the Value Analysis Committee. (*Id.*) After the review, McLeod decided to switch from BSN to PMA. (*Id.* ¶ 5.) According to VanAlstine, Guy subsequently told VanAlstine that the project had been put "on hold because someone had informed [Guy] that Parker and BSN were involved in a legal dispute and Parker would soon be unable to supply product to McLeod." (*Id.* ¶ 6.) McLeod later informed VanAlstine that McLeod "would not consider purchasing any Parker products until our dispute with BSN was concluded." (*Id.* ¶ 7.)

The court finds, and defendants appear to concede in their brief, that at least the following statement is hearsay–Guy's statement to VanAlstine that "someone" had informed Guy that PMA and BSN were involved in a legal dispute and PMA would soon be unable to supply product to McLeod. Defendants contend, however, that this statement "is clothed with such other 'circumstantial guarantees of trustworthiness' as to be admissible under [Federal Rule of Evidence] 807, because no one else would have been the source of that

18

information." (Defs.' Br. Opp'n Pl.'s Objection to Declarations of Hedderman, Vanalstine, and Porter, p. 5, docket no. 286.)

The court does not agree. FED. R. EVID. 807(a) states, in relevant part, that "a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804 . . . [if] the statement has equivalent circumstantial guarantees of trustworthiness." Defendants simply have not met their burden of showing circumstantial guarantees of trustworthiness for the court to consider what is clearly inadmissible hearsay. Furthermore, although defendants assume that a BSN employee told Guy about the lawsuit, Guy did not even identify a BSN employee as the person who allegedly told him about the lawsuit. Guy merely told VanAlstine that "someone" told him about the lawsuit. This statement is a classic example of inadmissible hearsay that a court may not consider at the summary judgment stage. Thus, the court will not consider the statement in ruling on the summary judgment motions.

The court further finds that, although other statements in the VanAlstine Declaration are not hearsay and may otherwise be admissible, they are simply not relevant to defendants' counterclaims separate and apart from the accompanying inadmissible hearsay statement, as the court has already explained in its discussion of the Porter Declaration. Therefore, the court will not consider the VanAlstine Declaration in addressing the motion for summary judgment.

### c. Hedderman's Declaration

Plaintiff BSN also objects to Paragraphs 4 through 8 of the Hedderman Declaration.

19

In Hedderman's Declaration, Hedderman recounts that he performed a product demonstration for Scott & White, after which Scott & White technicians asked if they could purchase PMA splinting products, and Scott & White's Orthopedic Department Manager also stated her intention to switch to PMA products. (Hedderman Decl. ¶¶ 3, 4, 5.) In Paragraph 6, Hedderman states: "A few weeks later I called to set up the conversion dates at which time Ms. Addington indicated that she would [sic] was uncomfortable switching because of the lawsuit. I asked her what lawsuit and she stated that a BSN representative told her that Bruce Parker was being sued." (*Id.* ¶ 6.) According to Hedderman, the BSN employee made this statement *before* BSN had filed the lawsuit against PMA.

Defendants admit that the second sentence of Paragraph 6 is hearsay because it is offered to prove the truth of the matter asserted–that a BSN representative told Addington that PMA was being sued. Defendants contend, however, that the statement is accompanied by such other "circumstantial guarantees of trustworthiness" as to be admissible under FED. R. EVID. 807. Defendants contend that the statement has circumstantial guarantees of trustworthiness because, at the time the statement was made, and when Scott & White decided not to purchase products from PMA, plaintiff had not yet filed this lawsuit against defendants. Defendants contend that "Scott & White had no motive to lie to Parker Medical about the reason it changed its mind and the fact that a lawsuit was mentioned and later filed strongly supports the inference that BSN told Scott & White about the lawsuit." (Defs.' Br. Opp'n Pl.'s Objection to Declarations of Hedderman, VanAlstine, and Porter, p. 3, docket no. 286.)

20

The court does not agree with defendants that the statement in Paragraph 6 is accompanied by circumstantial guarantees of worthiness so as to be admissible under Rule 807. Therefore, the court will not consider the statement on summary judgment. The court further finds that, although Hedderman's Declaration contains other statements that are admissible, without the inadmissible, hearsay statement, those portions of Hedderman's Declaration simply become irrelevant. As the court has discussed above, Hedderman's, VanAlstine's, and Porter's statements are only relevant to prove defendants' contention that BSN employees were telling potential customers of defendant PMA that PMA was being sued and therefore would not be able to supply products in the future, and that PMA would even be out of business soon because of the lawsuit. In sum, for the reasons stated, the court will not consider Hedderman's Declaration on summary judgment.

**2.    Plaintiff's Motion to Strike Section F of Defendants' Brief in Opposition to Plaintiff's Objection to Declarations of Hedderman, VanAlstine, and Porter (docket #290)**

In Section F of its brief objecting to the Declarations of Hedderman, VanAlstine, and Porter, (docket #286, p. 8), defendants objected to various evidence submitted by plaintiff as inadmissible. Plaintiff has, in turn, filed a motion to strike Section F on the ground that Section F is outside the proper scope of filing and raises new and previously unasserted objections to plaintiff BSN's evidence that were not in defendants' original objections.

The court declines to strike Section F of defendants' brief in opposition to plaintiff's objection to the Declarations of Hedderman, VanAlstine, and Porter. Furthermore, rather

21

than addressing defendants' objections as to each alleged statement here, the court will address the objections in the event this matter proceeds to trial. The court further finds that each party will be responsible for its own attorney's fees and costs related to the motion to strike.

### C.    Defendants' Motion for Summary Judgment

Defendants contend that the court should grant summary judgment as to all of plaintiff's claims. The court will address the parties' arguments as to each claim in turn.

### 1.    The Parties' Contentions that the Other Party Has Failed to Show Proof of Damages Sufficient to Withstand Summary Judgment

The court first notes that both parties argue on summary judgment that the other party has failed to present sufficient evidence of damages with respect to each of their claims and/or counterclaims. The court recognizes and accepts the parties' contentions that damages are necessary elements of the various claims and counterclaims. Courts have overwhelmingly held, however, that once the elements of a cause of action are established, a plaintiff is "entitled to recover at least nominal damages." *Hawkins v. Hawkins*, 331 N.C. 743, 745, 417 S.E.2d 447, 449 (1992); *see also PFB, LLC v. Trabich*, 304 Fed. App'x 227, 228 (4th Cir. 2008) (unpublished) (stating that "even though [plaintiff] failed to provide evidence sufficient to support its claims for lost profits or out-of-pocket expenses, its cause of action for breach of contract cannot fail as a matter of law because [plaintiff] is entitled to, at the very least, nominal damages, if the fact-finder determines there was a breach").

Here, the court is satisfied, after hearing oral argument on the respective motions for

summary judgment, and after pouring through the voluminous records in this case, that if either party were to succeed on each of its claims, either party could prove nominal damages of at least $1. Therefore, the court will decline to award summary judgment to either party based on their respective contentions that the other party has failed to offer sufficient proof of damages on summary judgment. *Accord Pharmanetics, Inc. v. Aventis Pharms., Inc.*, No. 5:03-CV-817-FL(2), 2005 WL 6000369, at *17 (E.D.N.C. May 4, 2005) (in a case involving Lanham Act, tortious interference with contract, and unfair and deceptive trade practices claims, observing that courts "have recognized nominal damages for common law unfair competition or trade practices claims," and concluding that "regardless of whether plaintiff has presented evidence tending to establish a specific amount of damages in this case, summary judgment . . . is improper at this time").

**2.     Defendants' Motion for Summary Judgment As to Each of Plaintiff's Claims**

**a.     Defendants' Contention that Defendants Are Entitled to Summary Judgment as to Plaintiff's Trade Secrets Appropriation Claim**

The North Carolina Trade Secrets Protection Act, N.C. GEN. STAT. § 66-152(3), defines a "trade secret" as:

> business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
>
> a.     Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain

23

economic value from its disclosure or use; and

b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C. GEN. STAT. § 66-152(3). The Trade Secrets Protection Act further provides that

[m]isappropriation of a trade secret is prima facie established by the introduction of substantial evidence that the person against whom relief is sought both: (1) Knows or should have known of the trade secret; and (2) Has had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner.

Id. § 66-155.

Plaintiff identifies two "trade secrets" forming the basis for plaintiff's trade secrets claim against defendants: (1) the process used to apply polyurethane resins or other coatings to substrates, which plaintiff describes as the "Coating Trade Secret," and (2) the method to insert the Ortho-Glass product into the foil sleeve, i.e., the "Foil Method." (Pl.'s Supp. Resp. Int. No. 5, p. 2, Td17 Tab 12.) Defendants contend that neither of the above constitutes a trade secret within the meaning of N.C. GEN. STAT. § 66-152(3).

### 1. The Foil Method

As previously noted, under the 1996 Asset Purchase Agreement ("APA") between PMA and Smith & Nephew, Smith & Nephew expressly purchased certain intellectual property, including "[a]ll Trade Secrets and other proprietary or confidential information used primarily in connection with the Splinting Business."[8] The parties defined the term

---

[8] PMA also sold the existing patents on the Ortho-Glass packaging system to Smith & Nephew, including six U.S. patents, two U.S. patent applications, one non-U.S. patent, and two pending non-U.S. patent applications. Defendants contend that most or all of the value in the

24

"Trade Secrets" to include "the process used to apply polyurethane resins or other coatings to substrates and method used to insert the Ortho-Glass product into the foil sleeve." (Schedule 5.15 to the APA, p. 27 Td17 Tab 2.) Thus, the APA between PMA and Smith & Nephew described the Foil Method as one of the trade secrets that defendant PMA sold to Smith & Nephew. In support of their summary judgment motion, defendants contend now that the Foil Method is not a trade secret.[9] Specifically, defendants contend that, even if the Foil Method was defined as a "trade secret" under the APA, it is no longer a trade secret within the meaning of N.C. GEN. STAT. § 66-152(3)(a) because since execution of the APA it has become "generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use."

Defendants have presented evidence of deposition testimony and declarations from eleven people in the splinting industry stating that they know the Foil Method and that they would openly share the method with anyone. Of those eleven people, seven stated that they (1) witnessed the Foil Method openly in use by other manufacturers; (2) are under no

---

$44 million purchase was derived from the sale of the patents. Nevertheless, defendants cannot deny that, even if considered to have little value, PMA's trade secrets as defined under the APA were also clearly sold to Smith & Nephew. In other words, even if at the time of the APA the parties considered the trade secrets to be valued at merely $1, the fact is at the end of the transaction, Smith & Nephew was the owner of the trade secrets and PMA was not.

[9] Defendant PMA has described in detail the Foil Method in its brief, but the court will not repeat it here because of the ongoing protective order in this case. The court notes that it is undisputed that, when PMA began manufacturing a roll-form splint, it did so using the Foil Method. Plaintiff notes that, in its Rule 30(b)(6) deposition, PMA testified that, although PMA changed its method in response to a cease-and-desist letter sent by BSN in September, before that time PMA was inserting its roll-form splint product in the foil "the same way that Parker Medical Associates, LP put it in before the sale to Smith and Nephew[.]" (PMA Tr. 245:6-18.)

obligation to keep the method confidential; (3) have shared the information with defendants and their counsel, and would share it with others; and (4) do not consider it proprietary or confidential. Five of the eleven people stated that they (1) have personally seen the Foil Method used at Smith & Nephew; (2) are under no obligation to keep it confidential; and (3) have shared the information with defendants and their counsel, and would share it with others. Defendants maintain that the fact that the Foil Method is openly in use by others and readily ascertainable just by asking people who will freely share it means that the method cannot be a trade secret. *See* N.C. GEN. STAT. § 66-152(3)(a). Defendants further contend that the Foil Method does not derive independent actual or potential *commercial value* from *not being generally known* because it is less efficient than other known methods. For these reasons, defendants contend that the Foil Method is not a trade secret.

In response, plaintiff contends that defendants have admitted that they sold the Foil Method as a "trade secret" under the APA and that they went back into business using it with no actual knowledge that anyone else was using it. As to defendants' contention that the Foil Method is "generally known" because eleven people in the industry know it, plaintiff contends that five of those people are former PMA/Smith & Nephew employees, and defendants are now estopped from claiming that their knowledge renders the process generally known. Plaintiff contends that of the remaining six people, four allegedly knew the process from M-PACT. Plaintiff contends that the testimony of these four people establishes that "whatever process they were familiar with, it was *not* the [Foil Method]," as the M-PACT process was clearly different from the Foil Method. (Pls. Br. Opp'n Defs.'

Mot. Summ. J., p. 22.)

Plaintiff further contends that the only other evidence showing that the Foil Method was used by another company is isolated testimony of two witnesses that the Foil Method was used at two Korean manufacturers and at CNF. Plaintiff contends that the fact that the Foil Method may have been independently developed by others does not negate its status as a trade secret because the trade secret may only be negated if a competitor learned about the trade secret through *proper* means. Plaintiff contends essentially that whether others had learned about the Foil Method through proper means is an issue of fact for the jury to decide and therefore summary judgment is not proper.

Plaintiff further contends that there is a material dispute of fact as to whether defendants' current process, if not exactly the same as the Foil Method, is *derived* from the Foil Method so that defendants can be held liable for misappropriation. Finally, plaintiff contends that, regardless of whether defendants can show that at some point after execution of the APA the Foil Method became generally known by others through proper means, defendants should be estopped from arguing that the Foil Method was generally known or readily available at the time that the APA was executed since defendants specifically defined the Foil Method as a trade secret under the APA.

### 2. PMA's Manufacturing Process, or the "Coating Trade Secret"

Next, with respect to PMA's manufacturing process, defendant PMA contends that it does not use the Ortho-Glass Process, a highly detailed set of instructions which must be followed to make a specific product. As part of the parties' respective arguments regarding

27

the manufacturing process for Ortho-Glass, the parties first dispute whether the coating process for the splints made by PMA is a trade secret and whether defendants have misappropriated it. Defendants describe the coating process as "dosing and wicking," which defendants describe as pouring a measured amount of polyurethane resin onto a substrate in a container and allowing it to wick throughout the material to obtain an even coating. Defendant Parker learned the dosing and wicking procedure at Reeves Brothers and he used it at Zimmer before forming PMA.

According to defendants, dosing and wicking is generally known in the splinting and casting industry and, therefore, cannot be a trade secret. *See* N.C. GEN. STAT. § 66-152(3). Defendants have presented the sworn declarations or deposition testimony of twelve people in the industry attesting to the fact that dosing and wicking is generally known throughout the industry. Defendants further note that, besides PMA and plaintiff, the following entities have also used the dosing and wicking procedure: Zimmer, Orto-Tec, Clinitex, M-PACT, DeRoyal, Kirchner, CNF, ALL CARE, and FLA Orthopedic.

Defendants further contend that, with regard to Zimmer specifically, Zimmer took no efforts to protect the dosing and wicking procedure from disclosure; thus, the procedure was not "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." N.C. GEN. STAT. § 66-152(3). Defendants state that, of the nineteen people at Zimmer with knowledge of the dosing and wicking procedure, between ten to thirteen engineers or technicians left for other companies. Furthermore, at least four of those companies have used the dosing and wicking procedure to manufacture splinting or casting

28

products, including Clinitex, FLA Orthopedic, PMA, and plaintiff BSN. Donna Miller

knows the procedure and worked at Zimmer, PMA, FLA Orthopedic, and BSN. Vendors,

including Horace Freeman of CNF, had access sometime between 1982 and 1987 to

manufacturing facilities at Zimmer where the dosing and wicking procedure was used.

Defendants note that Freeman and CNF later took over Zimmer's manufacturing operation.

Furthermore, Zimmer's manufacturing process evolved into the one that CNF currently uses

to manufacture its synthetic splinting products. Defendants note, further, that at least twelve,

non-PMA witnesses testified that they would freely disclose the dosing and wicking process

to anyone interested in knowing it. Finally, defendants note that dosing and wicking was

publicly disclosed in U.S. Patent 6,231,533, for splints. Defendants contend that since it is

disclosed in a patent, dosing and wicking cannot be a trade secret.

    In further support of their contention that they cannot be held liable for trade secrets

misappropriation, defendants note that plaintiff has described the "Ortho-Glass trade secrets"

as including, among other things, "the specific combination of specific layers of knitted glass

to create a substrate that holds in resin well . . . ."[10] (Supp. Resp. Int. No. 5, Td17, Tab 12.)

Defendants further note that plaintiff's Rule 30(b)(6) designee described the trade secrets as

follows, in part: "(1) Combination of specific layers of knitted glass to create a substrate that

---

[10] Plaintiff defined the Ortho-Glass manufacturing process in more specific detail in the discovery response. Because the parties' discovery responses are subject to a protective order, the court will not repeat plaintiff's answer here. It is undisputed, however, that defendants' manufacturing process is not the exact same as plaintiff's manufacturing process. Of course, the parties differ over whether the differences are material for the purpose of plaintiff's trade secret claim.

holds in resin well . . . ." (Td17, Tab 14.)

Defendants contend that it is undisputed that PMA's process is different in every material respect from the process BSN has identified as its trade secret. Defendants contend that PMA's process differs from the Ortho-Glass Process in at least twelve critical ways, including the construction of the pre-sewn rolls of knitted fiberglass and the formula of the polyurethane resin. (Parker Decl. ¶¶ 46-48; Parker1 224:1-239:3; Parker3 80:20-92:9, 172:19-173:1, Franklin 4:7-14; 94:20-102:14; 105:2-110:18.) Defendants note, further, that plaintiff's own expert and employee Mark Grady admitted that the concepts for each of these different elements are generally known. Specifically, Grady stated that (1) splints can be made of fiberglass substrates and polyurethane resin; (2) substrates can be reverse engineered; (3) uncured polymer resin moves through substrates; (4) heating of resin increases viscosity; (5) heat and the passage of time assists in the even spreading of liquid through fabric; (6) effects of gravity need to be accounted for; (7) resin is not lost in the absorption process; (8) in order to end up with a specific ratio of substrate to resin, one needs to start with a defined ratio; and (9) the use of a sealed bag during the curing period is necessary to prevent moisture from entering the process. (Grady 49:23-55:8.)

Therefore, defendants contend that PMA does not use any trade secret of plaintiff's. *See, e.g., Texas Urethane, Inc. v. Seacrest Marine Corp*., 608 F.2d 136, 139 (5th Cir. 1979) (applying North Carolina law, holding that when formulas are different there is no misappropriation, noting that "the proportions of the [defendant's] formulas were different from those of the various [plaintiff's] formulas. Some ingredients differed only slightly in

30

quantity; other differences were greater."); *see also Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1267-68 (7th Cir. 1992) (holding that defendants were not liable for misappropriation where they made their product from a polyurethane plastic like the plaintiff, used 60% glass fibers instead of 30% used by the plaintiff, and where there was no evidence that the defendants used their knowledge of the plaintiff's composition to develop their blades).

In response to defendants' motion for summary judgment, plaintiff contends that defendants are violating plaintiff's trade secret with regard to its manufacturing process because defendants' process is *derived from* plaintiff's process, which plaintiff refers to as the "Coating Trade Secret" process, or CTS. First, as to defendants' contentions regarding the dosing and wicking procedure, according to plaintiff, defendants have admitted that the CTS constitutes a trade secret. Plaintiff contends that, to avoid this, defendants have "recast" plaintiff's position as being limited to protection of the process they characterize as dosing and wicking, which, according to plaintiff, is merely *part* of the overall CTS. Plaintiff contends that the evidence shows that the actual general CTS process used by plaintiff has only been employed by one company, aside from the parties in this lawsuit, in order to manufacture synthetic splints, and that company learned the process from Parker. That is, according to plaintiff, although some companies have used a dosing and wicking process to manufacture cast tape, not one of these, other than CNF, has applied it to commercially manufacturing splints. Plaintiff contends, furthermore, that most of the companies viewed the process as a testing process *only*, not as an effective means of mass manufacture.

31

Plaintiff notes that, in fact, M-PACT apparently rejected the process, despite witnessing CNF using it, as not being useful for mass manufacture.  Plaintiff contends that

> it appears, then, that to the extent that a similar process is known in the cast tape industry, it is generally not considered to be capable of efficiently manufacturing product on a large scale.  BSN's use of the general process flies in the face of this commonly held misconception, and that in and of itself is evidence that the process is a trade secret–while others may have an idea of it, they have no idea that it can be used to economic advantage.

(Pl.'s Br. Opp. Summ. J. p. 15.)

Furthermore, according to plaintiff, defendants need not be using the *same exact* process as plaintiff in order to be found liable for misappropriating plaintiff's trade secrets.  *See, e.g., Reingold v. Swiftships, Inc*., 126 F.3d 645, 651 (5th Cir. 1997) (stating that "[o]utright and forthright duplication is a dull and very rare type of infringement") (quoting *Graver Tank & Mfg. v. Linde Air Prods. Co.*, 339 U.S. 605, 607 (1950)).  Rather, courts have found misappropriation where the substance of the new process is derived from another's secret.  *See, e.g., Reingold*, 126 F.3d at 651.  Plaintiff contends that the evidence shows that PMA's process is clearly derived from plaintiff's CTS.  Plaintiff notes, for instance, that Bruce Parker has himself described what he "changed" from the CTS to make Parker's current coating process.  (Expert Dep. of Bruce Parker Vol. I ("Parker Expert I") 81:13-17, 84:12, 84:25, 85:8-86:3, 87:2-11, 88:12-19, 88:20-89:4, 90:13-16 ("So the Ortho-Glass process I consider to be that part, and as you can see I do not believe that there is a single element within there that is identical *and many are changed* quite significantly.")  Furthermore, in the Rule 30(b)(6) deposition, PMA testified that it was entitled to replicate

32

the "know-how used that [it] had to make [the Ortho-Glass] product" "as closely as [it] could replicate it." Finally, plaintiff notes that Bruce Parker testified that the only part of the CTS he felt he could not use was the construction of the substrate and the container it was heated in. (PMA Tr. 86:1-16; Parker Tr. 255:18-258:6.)

Plaintiff contends that defendants' own evidence and testimony illustrates exactly how the Ortho-Glass Trade Secret evolved, one small change at a time, into the coating process that defendants currently use. According to plaintiff, a direct comparison of defendants' current process for producing the Parker splinting products and defendants' process for producing Athletic Products shows that the two are virtually identical. Scott Franklin, the principal person carrying out Parker's instructions in developing the Parker Coating Process, testified that the process used by PMA to make splinting products is virtually identical to the process used by Parker Athletic. (Franklin Tr. 64:8-68:16.) Franklin testified that the Parker Splinting Product was initially made together *with* the athletic product, placed in the same heated room, rotated on the same schedule, and left in for the same amount of time. (Franklin Tr. 88:24-90:21.) According to plaintiff, then, taking the evidence in the light most favorable to plaintiff on summary judgment, defendants clearly derived their current coating process from the trade secret process they sold to plaintiff, and they are not entitled to summary judgment as to plaintiff's trade secret appropriation claim.

Here, the court finds that a genuine issue of fact exists as to whether the process that plaintiff refers to as CTS is a trade secret. That is, the court finds that there is a genuine issue of fact as to whether the general CTS process used by plaintiff is generally known to be a

33

viable and efficient means of large-scale splint manufacturing. The court further finds that there are genuine issues of fact as to whether defendants are using the same overall manufacturing process to produce their splinting products in a manner that constitutes appropriation of plaintiff's trade secrets in manufacturing their Ortho-Glass products. Therefore, the court will deny defendants' summary judgment motion as to this part of plaintiff's trade secrets appropriation claim.

The court further finds that there are genuine issues of fact as to whether the Foil Method constitutes a trade secret–that is, whether the Foil Method is currently generally known or readily available in the splinting industry and was obtained through proper means. The court does agree with plaintiff, however, that defendants will be estopped at trial from contending that the Foil Method was not a trade secret when the APA was executed. Defendants undeniably asserted in the APA that the "method used to insert the Ortho-Glass product into the foil sleeve" was a "trade secret" that defendant PMA was selling to Smith & Nephew as part of the $44 million purchase under the APA. Therefore, even if defendants can show at trial that at some point the Foil Method ceased to be a trade secret under N.C. GEN. STAT. § 66-152(3)(a), defendants clearly represented the Foil Method as such when the APA was executed.

**b.    Defendants' Contention that They Are Entitled to Summary Judgment as to Plaintiff's Claim Against Defendant Bruce Parker for Breach of the Employment Agreement and Against Defendant PMA for Breach of the License Agreement**

34

As noted, when the APA was executed, defendant Parker became employed with Smith & Nephew, and he entered into an Employment Agreement. At the same time, defendant PMA entered into a License Agreement with Smith & Nephew. Defendants have now filed a motion for summary judgment as to plaintiff's claim against defendant PMA for breach of the License Agreement. Furthermore, the parties have filed cross motions for summary judgment as to plaintiff's claim against Bruce Parker for breach of the Employment Agreement.

## 1. The Employment Agreement

The Employment Agreement had a six-year covenant not to compete, after which time defendants were allowed to compete using the Parker Medical name and sell the same products as long as Parker did not use "Confidential Information" or infringe the patents. (APA § 8.1, p. 43; Emp. Agmt. § 6(b), p. 5; Darcey 60:9-63:12, 71:7-75:4, 99:13-100:9.) The Employment Agreement defined "Confidential Information" as "information, observations and data obtained by [Parker] while employed by the Company pursuant to this Agreement, as well as those obtained by [Parker] while employed by the Company . . . prior to the date of this Agreement, concerning the business or affairs of the Company or any of its subsidiaries or affiliates or any predecessor thereof[.]" The Employment Agreement specifically stated that certain information was *not* confidential and was fully available for Parker to use:

> (i) information or data that is or becomes generally known within the industry to which [Smith & Nephew] belongs other than as a result of the Employee's acts or omissions to act, (ii) information or data which the Employee can

35

demonstrate to be known by the Employee prior to Employee's employment with Parker.

(Emp. Agmt. ¶ 5, p. 4.)

In opposing plaintiff's motion for partial summary judgment as to the Employment Agreement, defendants first contend that plaintiff has no standing to sue under the Employment Agreement because BSN did not assume all of the liabilities of Smith & Nephew as required by paragraph 13 of the Employment Agreement. Defendants further contend that the Employment Agreement has been completely performed and, therefore, was not transferred as a "Contract" under the Business Asset Transfer Agreement.

Defendants further contend that Parker did not breach the Employment Agreement because the Agreement specifically authorized Parker to use information and techniques he learned *before* his employment at PMA and information that is or becomes generally known. Defendants contend that all of the techniques and information Parker has used to develop PMA's new process are based on knowledge he acquired before he formed PMA or information that is generally known. Defendants contend, for instance, that it is undisputed that Parker knew about and used the dosing and wicking procedure at Zimmer before his employment at PMA. Furthermore, Parker informed Smith & Nephew during Smith & Nephew's due diligence process that Parker learned the dosing and wicking procedure before his employment with PMA, and Smith & Nephew specifically noted that fact in its due diligence reports. Defendants contend further that neither the dosing and wicking procedure nor the Foil Method is Confidential Information within the meaning of the Employment

36

Agreement because they both became "generally known within the [splinting and casting] industry . . . ."  (Emp. Agmt. § 5(i) p. 4.)

In response, and in support of its own motion for summary judgment as to breach of the Employment Agreement, plaintiff contends that defendant Bruce Parker indisputably breached the Employment Agreement by disclosing and misusing Confidential Information, as that term is defined under the Employment Agreement.   According to the Employment Agreement, Confidential Information refers to "information, observation, and data obtained" by Parker during his employment, as defined in the Employment Agreement, which specifically includes information, observations, and data obtained while working for PMA before the ADA.  The Foil Method was developed in 1987 by a temporary employee of PMA named Julie Froede while Parker was employed by PMA.  Plaintiff contends that it was, therefore, part of the Confidential Information that defendant Parker agreed not to disclose to any unauthorized individual or use for his own account.  Plaintiff contends, however, that when Parker formed PMA and re-entered the splinting market, he admittedly did so using roll-form splints that were packaged using the Foil Method.  Plaintiff contends that defendant Parker therefore breached the plain terms of the Employment Agreement.

## 2.    The License Agreement

As to plaintiff's claim for breach of the License Agreement, plaintiff claims that defendant PMA breached Articles 2.1(a) and 4.1(c) of the License Agreement.  Under Article 2.1(a), Smith & Nephew granted PMA a nonexclusive licence to "use the Know-How solely to manufacture in the United States custom formed devices, designed and promoted for the

37

mechanical production of the body from contact sporting injuries." The License Agreement defines "Know-How" as "the confidential and proprietary ideas, trade secrets, know-how, concepts, methods, processes, designs, formulae, reports, data and technology identified on Schedule 1 attached hereto and made a part thereof." Schedule 1, in turn, identifies "Know-How" as [t]he process used to apply polyurethane resins or other coatings to substrates." Article 4.1(c), titled "Confidentiality and Nondisclosure," states that "Parker acknowledges and agrees that the Know-How and Patent constitutes Confidential Information, the disclosure of which to, or use by, third persons will be irreparably damaging to S & N. Each party agrees to use the Confidential Information only for purposes consistent with this Agreement."

Plaintiff contends that defendant PMA is using the Ortho-Glass trade secret of "the process used to apply polyurethane resins or other coatings to substrates and method used to insert the Ortho-Glass product into the foil sleeve" in the manufacture and selling of fracture casting and splinting products. Plaintiff contends that defendant PMA has, therefore, breached Article 2.1(a) of the License Agreement, which restricts use of the licensed Know-How solely to manufacture of PMA's athletic products (*i.e.*, "custom formed devices designed and promoted for the mechanical protection of the body from contact sporting injuries"). Plaintiff further contends that defendant PMA has also breached Article 4.1(c) of the License Agreement by using confidential information in the manufacture and selling of fracture casting and splinting products.

In response, defendants contend that PMA did not breach the license agreement,

38

which applies only to the Ortho-Glass Process, because PMA does not use the Ortho-Glass Process. Defendants further contend that plaintiff cannot make any claim based on any use of the Foil Method because the License Agreement relates *only* to the process of coating the substrates with resin, *not* the method of inserting the product into a foil sleeve. Finally, defendants contend that PMA does not use any "confidential" information in breach of the License Agreement, as "confidential" information excludes all information obtained before the creation of PMA.

The court first finds that both the Employment Agreement and License Agreement were properly assigned to plaintiff. The Employment Agreement between Smith & Nephew and Parker is governed by the substantive law of Tennessee. (*See* Employment Agreement ¶ 14.) The License Agreement between Smith & Nephew and PMA is governed by the substantive law of North Carolina. (*See* License Agreement ¶ 9.11.) In both North Carolina and Tennessee, contracts are generally assignable, and assignments are valid "unless prohibited by statute, public policy, or the terms of the contract, or where the contract is one for personal services or is entered into out of personal confidence in the other party to the contract." *Kraft Foodservice, Inc. v. Hardee*, 340 N.C. 344, 348, 457 S.E.2d 596, 598 (1995); *Williamson Cnty. Broad. Co. v. Intermedia Partners*, 987 S.W.2d 550, 553 (Tenn. Ct. App. 1998).

Here, under the express terms of the agreements, none of the agreements require consent for assignment. Furthermore, by the express terms of the BATA, plaintiff expressly assumed all of the obligations of Smith & Nephew. Thus, as an assignee of the APA,

39

plaintiff undertook to "perform all the obligations" of plaintiff under the APA, and plaintiff has standing to sue for breach of both the Employment Agreement and the License Agreement. Furthermore, as to defendants' contention that the Employment Agreement had been fully performed by the time that plaintiff BSN purchased Smith & Nephew, Section 9 of the Employment Agreement specifically states that Section 5 (the "Confidential Information" provision), Section 6 ("Non-competition; Nonsolicitation" provision), Section 7 ("Enforcement" provision), and 8 ("Intellectual Property" provision) "shall survive and continue in full force and effect in accordance with their respective terms, notwithstanding any termination of the Employment Period." (Employment Agmt. § 9.) Defendant Bruce Parker was therefore bound by Sections 5, 6, 7, and 8 even after his employment ended with Smith & Nephew. In sum, for the reasons stated, plaintiff has standing to sue for breach of the Employment Agreement and the License Agreement.

The court next finds that, for the same reasons that there are genuine issues of fact as to whether defendants misappropriated plaintiff's trade secrets, there are issues of fact as to whether defendant PMA breached the license agreement by using confidential secrets, *i.e.*, the Ortho-Glass Process in the manufacturing of defendants' medical splints, and whether defendant Bruce Parker breached the Employment Agreement.

**c.** **Defendants' Contention that Defendants Are Entitled to Summary Judgment as to Plaintiff's Fraud Claim Against Defendants**

To prove a claim for fraud against defendants, plaintiff must prove the following elements: (1) that defendants made a representation of a material past or existing fact; (2) the

representation was false; (3) defendants knew that the representation was false or made it recklessly without regard to its truth or falsity; (4) the representation was made with the intention that it would be relied upon; (5) plaintiff did rely on it and plaintiff's reliance was reasonable; and (6) plaintiff suffered damages because of its reliance. *Broughton v. McClatchy Newspapers, Inc.*, 161 N.C. App. 20, 31, 588 S.E.2d 20, 29 (2003). Plaintiff's fraud claim is based on a theory of fraud in the inducement, in which plaintiff BSN contends that defendants knowingly made false representations to Smith & Nephew in order to induce Smith & Nephew to enter the APA and to pay defendants $44 million. Plaintiff contends that the following representation about the Ortho-Glass Process to Smith & Nephew in Section 5.15(d) of the APA was fraudulent:

> Seller has developed the Trade Secrets included in the Purchased Assets through its own efforts and has taken reasonable steps to maintain and protect the confidentiality of such Trade Secrets, no representation or warranty is made as to whether any such Person might have independently developed such Trade Secrets.

(APA p. 27 [DE 1-3 p.5], Sec. Am. Compl. 4, 51-57, 98-105 [DE 210].)

The court finds that defendants are entitled to summary judgment as to plaintiff's fraud claim. As defendants note, during its due diligence process and before executing the APA, Smith & Nephew knew that Parker had learned dosing and wicking at Zimmer and, furthermore, that other parties likely knew and used the technique. For instance, Steve Lang recalled that he heard before the APA was signed that Orto-Tec, a Mexican supplier, also used dosing and wicking. (*See* Lang 11:6-24, "After considerable reflection and re-reading of my due diligence report, I believe that Smith & Nephew was aware that a Dosing and

41

Wicking procedure had been previously used by Bruce Parker at Zimmer to make cast tape and by Parker Medical for a Mexican supplier of cast tape.") Bob Lucas, Smith & Nephew's principal in-house lawyer, also noted that Zimmer used a similar process. (*See* Lucas Rep. p.13, "According to the due diligence report generated by Steve Land, the Parker manufacturing process is somewhat similar to that use by Zimmer.")

Furthermore, PMA has presented evidence that it *did* take reasonable steps to maintain and protect the confidentiality of the Ortho-Glass Process. Lucas further noted in a due diligence report before execution of the APA:

> The trade secret seems to be very well protected. The process is accomplished behind closed doors. However, access is not necessarily limited or restricted . . . . Additionally, there are no executed Confidentiality Agreements with those who come into contact with the trade secrets. According to Bruce Parker, many of the people who come into contact with the trade secret[] are not necessarily aware of its value or importance.

(Lucas Rep. p. 15.)

Other documents generated during Smith & Nephew's due diligence show that Smith & Nephew was also aware of PMA's relationships with Orto-Tec and Zimmer. (Lang 237:10-238:19, Td17 Tab 8; Lucas 183:22-186:4, Td17 Tab 7.) Finally, Smith & Nephew also knew before execution of the APA that Horace Freeman of CNF was familiar with PMA's manufacturing process. (*See* Adams 63:21-24, 64:11-14, 64:25-65:11, 65:18-67:4, 68:6-69:12, 189:14-190:20 Td 17 Tab 9.) Freeman had observed the dosing and wicking procedure at Zimmer, and the current CNF process is based on the Zimmer process. This evidence shows that, to the extent that *part* of the Ortho-Glass Process was not confidential,

Smith & Nephew knew this when the APA was executed. Therefore, plaintiff BSN simply cannot show that it reasonably relied on any alleged misrepresentations by defendants. In sum, for the reasons stated herein, plaintiff's fraud claim simply cannot withstand defendants' motion for summary judgment.[11]

Additionally, defendants are entitled to summary judgment as to the fraud claim because a personal tort claim such as fraud is not assignable. *See, e.g., Investors Title Ins. Co. v. Herzig*, 330 N.C. 681, 688, 413 S.E.2d 268, 271 (1992) ("The causes of action of conspiracy to commit fraud and unfair practice[s] are [] personal in nature. Therefore, the assignment of such claims violates our public policy and will not be enforced."); *Atl. Coast Mechanical, Inc. v. Arcadis, Gerahty & Miller of N.C., Inc.*, 175 N.C. App. 339, 340, 623 S.E.2d 334, 347 (2006) (stating that "tort claims are not assignable"); *Horton v. New S. Ins. Co.*, 122 N.C. App. 265, 268, 468 S.E.2d 856, 858 (1996) (stating that "assignments of personal tort claims are void as against public policy because they promote champerty" and "personal tort claims that may not be assigned include . . . unfair and deceptive trade practices and conspiracy to commit fraud"). Here, plaintiff BSN does not contend that

---

[11] Defendants additionally contend that the fraud claim is barred by the three-year statute of limitations. According to defendants, the alleged fraudulent representations were made in the APA on August 30, 1996. Defendants contend that the statute of limitations, therefore, expired at the latest on September 1, 1999, three years *after* execution of the APA. *See* N.C. GEN. STAT. § 1-52(9) (stating that for a fraud claim, "the cause of action shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud"). Plaintiff contends, in response, that the fraud claim is not barred by the statute of limitations because plaintiff did not discover the fraud until the course of this litigation. The court need not address the parties' respective statute of limitation arguments because the fraud claim fails on the merits.

defendants made any false representations to plaintiff BSN; rather, all of the alleged fraudulent statements were made to BSN's predecessor-in-interest Smith & Nephew. Thus, plaintiff BSN simply lacks standing to assert a fraud claim against defendants.

**_____d.  Defendants' Contention that Defendants Are Entitled to Summary Judgment as to Plaintiff's Claims of False Advertising and Unfair Competition under the Lanham Act, Tortious Interference with Actual and/or Prospective Economic Advantage, and Unfair and Deceptive Trade Practices**

In support of the false advertising/unfair competition claim against defendants, plaintiff contends that defendants have claimed repeatedly to third parties that their products are "the new Ortho-Glass," "identical to Ortho-Glass," "the original Ortho-Glass," and other variations on the theme that defendants are selling a product that is the same as Ortho-Glass. In its brief, plaintiff cites to numerous examples of such statements by defendants, including telling customers that defendant PMA is "reintroducing the original product," stating that PMA's products are "what amounts to the same thing as the original Ortho-Glass product," except for the "color of the ink and the name on the box," and telling a customer that EZY Splint was "identical to Ortho-Glass" except for its place of manufacture, its dispenser system, and the cost savings. Plaintiff contends that, in making these statements, defendants have "trad[ed] on plaintiff's goodwill and reputation, causing numerous clients to switch from Ortho-Glass to Defendants' product since their introduction in 2007." (Pl.'s Br. Opp'n Defs.' Mot. Summ. J., p. 10, docket 272.) Plaintiff contends further that, as a result of

defendants' statements, customers were confused and believed that PMA was selling Ortho-Glass or a product exactly the same as Ortho-Glass.

Plaintiff contends that defendants have admitted that its statements about PMA's products being the same as BSN's Ortho-Glass products are false. (Parker Tr. 164-65) (testifying that EZY Splint is *not* identical to Ortho-Glass); (Parker Expert 2 365:6-20) (stating that Parker Splint "is not the original Ortho-Glass"). Plaintiff further contends that, even if the statements were literally true, they are actionable under the Lanham Act because they were likely to mislead and confuse consumers into believing that the Parker splinting products are the same as the Ortho-Glass splinting products. *See Holland v. Psychological Assessment Res., Inc.*, 482 F. Supp. 2d 667, 684 (D. Md. 2007) ("[A] statement may give rise to a Lanham Act violation if 'although literally true, [it is] likely to mislead and to confuse consumers given the merchandising context.'") (quoting *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1138 (4th Cir. 1993) (alteration in original)). Plaintiff contends that the court should, therefore, deny defendants' motion for summary judgment as to this claim.

In response, defendants contend that the vast majority of statements cited by plaintiff are not actionable because the statements are inadmissible hearsay, were made by independent contractors or distributors, or they were not made to customers. Defendants contend in their response brief that only two of the documents that plaintiff contends constitute false advertising went to any of the four customers that plaintiff BSN identified in its interrogatory response as having received false statements: an email sent to Karen Keifer of THR, and a letter sent to Mary Anne Vallejo of Dallas Methodist. According to

45

defendants, neither contains any false or misleading statements. The first document is an email, dated May 1, 2009, and sent from Mark Hoag, PMA's National Sales Manager, to Keifer. The email from Hoag states, in relevant part:

> Bruce Parker was the *inventor and original patent holder of the 7 layer splinting products* your members have used years ago. Over the past few years though, Parker Medical has made some changes that customers have mentioned as positive. For example, some have noticed an improved clip and are impressed with our patent pending dispenser system–further improving Parker Splint's cost effectiveness potential. There are also *some in-house changes with our original 7-layer design* that only a chemist can explain.

(*See* Tab 60, attached to 17th Decl. of Christopher M. Thomas, docket 247.) First, defendants note that the email at issue was sent after THR had already made the decision to convert its business from plaintiff BSN to PMA. Defendants contend that because THR was already a customer of PMA when the email was sent, the email could not be a basis for a claim of damages against defendants.

The second document is a letter dated July 17, 2008, sent from Hoag to Mary Anne Vallejo of the Methodist Healthcare System in Dallas, Texas. (*See* Tab 61, attached to 17th Decl. of Christopher M. Thomas, docket 247.) The letter states, in relevant part:

> At this point a little background information on Parker Medical may be in order. As Vaner may have mentioned, Parker Medical was formed over 17 years ago. Its founder, Bruce Parker, was the original patent holder on OrthoGlass™ and after several years of rapid growth and making that brand the market leader in roll form splints, sold to Smith & Nephew. Eighteen months ago that patent expired and Parker Medical re-entered the market place. It is our proven manufacturing and technology expertise, in the same manufacturing facility that easily met the demands of a number of major hospital systems and purchasing organizations, which allows us to economically *re-introduce the original product* to the healthcare market now.

46

(*Id.*) (emphasis added).

With regard to the statement in the Vallejo letter that PMA was "reintroducing the original product," defendants contend that this statement is true, in that PMA was selling a seven-layer splint, the original Ortho-Glass Product was a seven-layer splint, and BSN has switched to a single-layer product. Defendants further contend that plaintiff had admitted that the statement is true. Defendants note that, in an email sent to six high-level BSN employees in June 2007, plaintiff's director of U.S. Marketing stated that the synthetic splinting products manufactured by PMA were "the exact same product" as Ortho-Glass. (Td17 Tab 62.) Defendants further note that plaintiff has stated that PMA's "Value Proposition" is that its product was "the original Ortho-Glass." (Td17 tab 63 at BSN 19344-45.) Defendants contend, therefore, that PMA's statement to Vallejo was not false or misleading.

In sum, defendants contend that they should be granted summary judgment as to plaintiff's false advertising claim. Defendants further contend that they are entitled to summary judgment as the Lanham Act claim, the tortious interference with actual and/or prospective economic advantage claim, and the unfair and deceptive trade practices claim, since all of these claims are based on the same allegations as the Lanham Act claim. *See Harrington Mfg. Co. v. Powell Mfg. Co.*, 38 N.C. App. 393, 400, 248 S.E.2d 739, 744 (1978) (noting that an advertisement that is neither false nor misleading is not unfair competition or an unfair or deceptive trade practice within the meaning of N.C. GEN. STAT. § 75-1.1).

The court will deny defendants' motion for summary judgment as to plaintiff's claim

47

for false advertising under the Lanham Act, as there are genuine issues of fact regarding the statements made by defendants and whether the statements were false. Initially, the court agrees with plaintiff that these statements could have at least confused consumers into believing that the Parker splinting products are the same as BSN's Ortho-Glass products. Furthermore, to the extent that defendants contend that at least some of the statements are inadmissible hearsay, the court can address these objections at trial. The court is satisfied, however, that plaintiff has provided sufficient evidence of at least some admissible statements by defendant PMA to third parties to support plaintiff's Lanham Act claim. In other words, taking the evidence in the light most favorable to plaintiff BSN as the court must do on summary judgment, there is sufficient admissible evidence from which a jury could find that defendant PMA made statements to third parties that led third parties to believe that PMA was selling Ortho-Glass or a product "exactly the same as" Ortho-Glass and that this statement was either false or misleading. Summary judgment is therefore not appropriate as to plaintiff's Lanham Act claim.

The court further observes that defendants appear to take two diametrically opposed positions with regard to plaintiff's trade secret appropriation claim and plaintiff's Lanham Act claim. That is, for the purpose of plaintiff's trade secret appropriation claim, defendants insist that the Parker splinting products were *not* made using the Ortho-Glass Process, that they are not the same as plaintiff's Ortho-Glass product, and that they are not even *derived from* the Ortho-Glass product. For the purpose of plaintiff's Lanham Act claims, on the other hand, defendants insist that their statements to customers that the Parker splinting products

48

are the same as the original seven-layer Ortho-Glass products are *true* and that plaintiff even admits that these statements are true. It appears to the court that, with regard to these two contrasting positions, defendants wish to have, as well as eat, their proverbial cake. This is yet another reason for allowing plaintiff's Lanham Act claim to survive summary judgment, as defendants will need to take one position or another before a jury responsible for fleshing out the Lanham Act and trade secret appropriation claims. In any event, as noted, there are simply genuine issues of fact with regard to plaintiff's Lanham Act claims. Additionally, because plaintiff's tortious interference and unfair and deceptive trade practices claims depend on the alleged false advertising claim, the court will also deny defendants' summary judgment motion as to these claims.[12]

### e. Defendants' Contention that Defendants Are Entitled to Summary Judgment as to Plaintiff's Claim against Defendants For Copyright Infringement

In 1997, Smith & Nephew registered U.S. copyright No. TX 00004517125 for the ORTHO-GLASS Splinting Manual, Second Edition (the "Splinting Manual"), a training

---

[12] To prove a claim for wrongful interference with prospective advantage, a plaintiff must show that the defendant acted without justification in "inducing a third party to refrain from entering into a contract with them which contract would have ensued but for the interference." *Walker v. Sloan*, 137 N.C. App. 387, 393, 529 S.E.2d 236, 242 (2000) (quoting *Cameron v. New Hanover Mem'l Hosp.*, 58 N.C. App. 414, 440, 293 S.E.2d 901, 917 (1982)). Where a plaintiff claims that the interference with business relations was rendered by a competing business entity, the court must determine whether the defendant was acting for a "legitimate business purpose" and was not merely motivated by a "malicious wish to injure the plaintiff." *Peoples Security Life Ins. Co. v. Hooks,* 322 N.C. 216, 221, 367 S.E.2d 647, 650 (1988). It is well settled that business competition constitutes justifiable interference in another's business relations and is not actionable as long as it is carried on in furtherance of the defendant's own interests and by lawful means. *Id.*

booklet that Smith & Nephew provided to its customers. The Splinting Manual provides illustrations and instructions for creating better splints, including guides to common splint types, "Preparation Guidelines" for the Ortho-Glass product, "Tips for Better Splinting," and other suggestions for using the Ortho-Glass product. Smith & Nephew, and later BSN, excerpted text and illustrations from the Splinting Manual to create portable pocket charts, including the "OG Pocket Chart," which allow end users to carry the most pertinent information from the Splinting Manual with them at all times, including the "Preparation Guidelines," the "Tips for Better Splinting," and a list of common splints.

PMA hired graphic designer Nancy Roth as a freelance contractor[13] to collaborate with Smith & Nephew's product manager Tom Darcey and Ken Hawkins to create the Splinting Manual. The three worked together on the manual at the same time, with Roth creating all of the illustrations and graphics for the Splinting Manual. As product manager for Smith & Nephew, Darcey directly controlled the graphics, verbiage, and layout for the Manual. (Darcey Decl. ¶ 7, Ex. 14 to docket no. 76.)

When PMA re-entered the splinting business, it created its own pocket chart, the "PMA Pocket Chart." In 2007, PMA hired Nancy Roth to assist in creating the PMA Pocket Chart. The PMA Pocket Chart has a Splinting Reference Chart on one side and Preparation Guidelines on the other. Plaintiff contends that the PMA Pocket chart was copied directly

---

[13] Plaintiff states in its response brief that BSN "ultimately" hired Roth as an employee "for a time, during which she updated the Splinting Manual and the OG Pocket Chart," and that Roth's work as an employee is "the full authorial property of BSN." (*See* Pl.'s Br. Opp'n Defs.' Mot. Summ. J., p. 12 n.10, docket no. 272.) Plaintiff does not assert, however, that Roth was an employee when she *initially* contributed to the creation of the Splinting Manual.

from the OG Pocket Chart, which plaintiff contends is a derivative work of the copyrighted Splinting Manual. Plaintiff contends that defendants are therefore liable for copyright infringement.

In support of their motion for summary judgment on the copyright infringement claim, defendants first contend that PMA did not copy the Splinting Manual. Defendants further contend that, even if PMA copied the Splinting Manual, PMA cannot be liable for copyright infringement because Nancy Roth was a joint author of the Splinting Manual. According to defendants, because Roth was a joint author, she had the right to give PMA an implied, nonexclusive license to use the Splinting Manual. Defendants contend that Roth's contributions of graphics, 65 illustrations, and overall layout are independently copyrightable and are sufficient to make her a joint author. *See* 17 U.S.C. § 102(a)(5). Defendants note, furthermore, that Roth did not transfer her rights in the Splinting Manual to Smith & Nephew. In sum, defendant PMA contends that it is entitled to summary judgment because it was granted an implied, nonexclusive license from Roth to use any of the works in which Roth had authorship rights in the creation of the Pocket Chart.

The court first notes that plaintiff's complaint alleged copyright infringement of *only* the copyrighted Splinting Manual. In response to defendants' motion for summary judgment, plaintiff argues that defendants copied plaintiff's OG Pocket Chart, which was not copyrighted. Defendants contend that because the OG Pocket Chart was not copyrighted, plaintiff cannot proceed with its copyright infringement claim based on copying of the OG Pocket Chart. In response, plaintiff contends that the OG Pocket Chart is a derivative work

51

of the Splinting Manual and, therefore, the copying of the OG Pocket Chart is a copying of the Splinting Manual. For the following reasons, the court agrees with plaintiff.

It is well settled that "[c]opyright protection extends not only to the original work copyrighted, but to any derivative work created by the copyright holder." *See John Wieland Homes & Neighborhoods, Inc. v. Poovey*, No. 03-cv-168, 2004 WL 2108675, at *5 (W.D.N.C. Aug. 2, 2004) (citing *Donald Frederick Evans v. Continental Homes, Inc.*, 785 F.2d 897, 904 (11th Cir. 1986) and 1 NIMMER ON COPYRIGHT § 3.05 ("if the material copied was derived from a copyrighted underlying work it will constitute an infringement of such work regardless of whether the defendant copied directly from the underlying work or indirectly from the derivative work")). The Copyright Act states that a "derivative work" is:

> a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, *abridgement, condensation, or any other form in which a work may be recast, transformed, or adapted.* A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work."

17 U.S.C. § 101 (emphasis added). The court has compared the OG Pocket Chart with the Splinting Manual and finds that the OG Pocket Chart is clearly a derivative work of the Splinting Manual. That is, the OG Pocket Chart contains language and graphics that are identical to parts of the Splinting Manual. Indeed, the OG Pocket Chart can fairly be described as a "condensed" or partial version of the Splinting Manual. Therefore, plaintiff may proceed on its contention that defendants copied the OG Pocket Chart in creating the PMA Pocket Chart.

52

The court first notes that defendants contend that, even if defendant PMA is ultimately determined to have copied the OG Pocket Chart, defendants are still entitled to summary judgment because Nancy Roth was a joint author of the Splinting Manual, and she therefore had the right to create a derivative work of it or to license others to do so. Before addressing the parties' arguments regarding whether PMA copied the OG Pocket Chart, the court will first address the parties' arguments regarding joint authorship. The facts regarding the issue of joint authorship do not appear to be in dispute. Therefore, the court may determine as a matter of law whether Roth was a joint author. *See Pulver v. Battelle Mem'l Inst.*, No. CV-05-5028, 2009 WL 224490, at *11 (E.D. Wash. Jan. 29, 2009) (concluding that the facts were undisputed and deciding the issue of joint authorship as a matter of law).

A "joint work" is "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. "The authors of a joint work are co-owners of copyright in the work." *Id*. § 201(a). Each joint author of a joint work has the right to use or license any portion of the joint work. *Strauss v. Hearst Corp.*, No. 85 Civ. 10017, 1988 WL 18932, at **5-6 (S.D.N.Y. Feb. 19, 1988). Furthermore, "[a] joint owner of a copyright and his licensees cannot be liable to a co-owner for copyright infringement because a copyright owner cannot infringe his own copyright." *Id*. at *5.

Finding that a work is a "joint work" requires both (1) intent to form a single work and (2) "contribution of independently copyrightable material" from each collaborator in the work. *Janky v. Lake Cnty. Convention & Visitors Bureau*, 576 F.3d 356, 361-63 (7th Cir.

2009) (granting summary judgment where defendant had a license from a joint author). With respect to the first element, the intent prong does not require a showing that the collaborators intended to recognize each other as co-authors for purposes of each having protection under the copyright laws. *Id.* at 362. Nevertheless, most courts have required some finding of an intent for co-authorship separate and apart from the parties' intent that their contributions be merged into inseparable or interdependent parts of a unitary whole.[14] *See Childress v. Taylor*, 945 F.2d 500, 507-08 (2d Cir. 1991) (finding intent of joint authorship is required to find a joint work, and noting that the test is not entirely subjective). Indeed, courts have stated that the intent test requires a "nuanced inquiry into the factual indicia of ownership and authorship," such as "how a collaborator regarded herself in relation to the work in terms of billing and credit, decision making, and the right to enter into contracts." *Thomson v. Larson*, 147 F.3d 195, 201 (2d Cir. 1998).

Here, the court first finds as a matter of law that Roth's contribution to the Splinting

---

[14] As courts have noted, in the absence of some indicia of intent for co-authorship, persons who were not targeted for protection under the Copyright Act would nevertheless fall under the definition of a "joint author" merely because they intended for their contributions to be merged into inseparable parts of a unitary whole. The Second Circuit has offered the following example:

> [A] writer frequently works with an editor who makes numerous useful revisions to the first draft, some of which will consist of additions of copyrightable expression. Both intend their contributions to be merged into inseparable parts of a unitary whole, yet very few editors and even fewer writers would expect the editor to be accorded the status of joint author, enjoying an undivided half interest in the copyright in the published work.

*Childress*, 945 F.2d at 507.

54

Manual (graphics, layout, and 65 illustrations) was independently copyrightable.[15]  *Accord*

*Words & Data, Inc. v. GTE Commc'ns Servs.*, 765 F. Supp. 570, 578 (W.D. Mo. 1991)

(where the defendant contributed to the "arrangement, layout, and graphic design" of the

work and supplied substantially all of the text).  Thus, the critical issue is whether each of

the collaborators of the Splinting Manual intended for Roth to be a joint author of the

Splinting Manual.  In support of the motion for summary judgment, defendants contend that

they have established that Roth was a joint author because they have proven the following

three elements: (1) the Splinting Manual was a copyrightable work; (2) there were two or

more "authors"; and (3) the authors mutually intended to merge their work into inseparable

or interdependent parts of a unitary whole.  *See* 17 U.S.C. § 101.  Defendants contend that

Roth, Darcey, and Hawkins all had such intent and that plaintiff has failed to point to any

contradictory evidence.  Defendants contend, therefore, as a matter of law, Roth was a "joint

author" of the Splinting Manual.

The court is satisfied that Darcey, Roth, and Hawkins all intended that their

contributions be merged into inseparable or interdependent parts of a unitary whole.  That

is, they intended for their work to be merged to create the Splinting Manual.  The court

further finds that defendants have produced evidence of intent of co-authorship such that the

---

[15]    Plaintiff contends in its response brief that defendant Bruce Parker himself
"admitted" that Roth's illustrations and/or depictions of the splints on the Splinting Manual were
not independently copyrightable.  Defendants contend that Parker made no such admission.
Regardless of whether Parker made this statement, the court will not consider it because it is a
legal conclusion.

court may conclude as a matter of law that Roth was a joint author of the Splinting Manual. Roth's contributions included all graphics, the layout of the work, and illustrations. Roth has further attested that her contributions to the layout of the work included making final decisions on its overall layout, including the placement of images, graphics, and text and how the overall work would be visually appealing to the end user. Roth has further attested that she did not sign any agreement transferring her rights in the Splinting Manual to Smith & Nephew or any other company. These facts all tend towards a finding that Roth was a joint author of the Splinting Manual. Although it is true that Roth was not given any billing or individual credit in the Splinting Manual itself, this fact does not preclude a finding by the court that Roth was a joint author of the Splinting Manual for the purpose of copyright protection. Courts have stated that "billing" or "credit" is *some* evidence of intent to create a joint work, but billing or credit is not required in order to find that a work is a "joint work." *See Janky*, 576 F.3d at 362.

In response to the motion for summary judgment, plaintiff has offered no evidence that the other collaborators on the Splinting Manual did not intend Roth to be a joint author, or any other evidence that would tend to show that Roth was not considered to be a joint author of the Splinting Manual. The court notes that plaintiff asserts in its response brief that Darcey, the Smith & Nephew employee in charge of creating the Splinting Manual, "testified that Ms. Roth did not have any real decision making authority and that S&N did *not* intend Ms. Roth to have authorship rights." (Pl.'s Br. Resp. Mot. Summ. J., p. 40, docket no. 272.) Plaintiff cites to Paragraphs 7 and 8 of the Darcey Declaration as support for this assertion.

56

As defendants note, however, the Darcey Declaration contains no such statement.[16]  (*See* Darcey Decl., Ex. 14 to docket no. 76.)  In sum, for the reasons stated herein, the court finds that Roth was a joint author of the Splinting Manual.

As a joint author of the Splinting Manual, Roth had the right to grant an implied, nonexclusive license to PMA in creating the PMA Pocket Chart.  An implied, nonexclusive license is created when (1) the licensee requests creation of a work; (2) the licensor creates the work and delivers it to the licensee; and (3) the licensor intends that the licensee will copy and distribute the work.  *Asia Apparel Co., LLC v. Cunneen*, No. 3:02cv469, 2008 WL 2949244, at *5 (W.D.N.C. July 30, 2008).  Here, the undisputed facts show that (1) PMA requested the creation of the pocket chart; (2) Roth worked with PMA to create the Pocket Chart and delivered it to PMA; and (3) Roth intended that PMA would make copies of and distribute the Pocket Chart.  Therefore, PMA is entitled to summary judgment as to

---

[16]  Darcey states in Paragraphs 7 and 8 of his Declaration:

7.      In creating the Ortho-Glass Splinting Manual, Second Edition, I chose the splints to be shown and the instructions on how to use the Ortho-Glass product to create them.  As product manager for Smith & Nephew, I directly controlled the graphics, the verb[i]age and the layout.

8.      Smith & Nephew, I and others used excerpted text and illustrations from the Ortho-Glass Splinting Manual, Second Edition to create the pocket charts.  Specifically, Jack Crutchfield of Crutchfield and Associates assisted me in producing a pocket chart which was similar to what I had seen used by drug companies to act as a quick pocket reference to clarify application and monitoring of patients.  Nancy Roth did not assist in creating the original Smith & Nephew pocket chart.

(Darcey Decl. ¶¶ 7, 8.)  The court is troubled by plaintiff's mischaracterization of Darcey's Declaration testimony, as *nowhere* in either Paragraph 7 or Paragraph 8 (or anywhere else in the Declaration) does Darcey state that Roth did not have any real decision-making authority and that Smith & Nephew did not intend Roth to have authorship rights in the Splinting Manual.

57

plaintiff's copyright infringement claim because it was granted an implied, nonexclusive license from Roth to use any of the works in which Roth had authorship rights in creating the PMA Pocket Chart.

**3.     Plaintiff's Motion for Partial Summary Judgment As to Defendants' Counterclaims**

Defendants have raised counterclaims against plaintiff for false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and North Carolina's Unfair and Deceptive Trade Practices Act, N.C. GEN. STAT. § 75-1.1.  Plaintiff has filed a motion seeking partial summary judgment as both counterclaims.[17]

**a.     Defendants' Lanham Act Counterclaim**

As noted, when PMA sold the patents to Smith & Nephew in 1996, Smith & Nephew received a monopoly on roll-form splints until 2007, when the last of the patents expired. Anticipating that it would lose market share because of the expiration of the patents, plaintiff BSN decided to change from a seven-layer substrate to a single-layer substrate hoping to extend its monopoly by creating a new patented product.  When the last Ortho-Glass patent expired, PMA began to make a seven-layer splint.  According to defendants, in response, plaintiff began conducting a false advertising and unfair trade practices campaign to discredit, disparage, and disable PMA.  Defendants contend that plaintiff is falsely

---

[17] As for plaintiff's motion for summary judgment with regard to its claim against defendant Bruce Parker for breach of the Employment Agreement, the court has already found that genuine issues of fact exist as to whether Bruce Parker breached the Employment Agreement.

representing that PMA's synthetic splinting products are likely to wrinkle, causing pressure points, and that they are also likely to delaminate, *i.e.*, cause the splint to break down. Defendants contend that these statements violate the Lanham Act and North Carolina's Unfair and Deceptive Trade Practices Act, N.C. GEN. STAT. § 75-1.1.

To withstand summary judgment as to a claim for false advertising under the Lanham Act, defendants must show that (1) plaintiff made a false or misleading description or misrepresentation of fact in a commercial advertisement about its own or another's product; (2) the misrepresentation was material, in that it was likely to influence the purchasing decision; (3) the misrepresentation actually deceived or had the tendency to deceive a substantial segment of its audience; (4) plaintiff placed the false or misleading statement in interstate commerce; and (5) defendants have been or are likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products. *See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 272 (4th Cir. 2002). Under the Lanham Act, a statement is actionable if it is "either false on its face or, although literally true, likely to mislead and to confuse consumers given the merchandising context." *C.B. Fleet Co. v. SmithKline Beecham Consumer Healthcare, L.P.*, 131 F.3d 430, 434 (4th Cir. 1997).

Defendants contend that plaintiff's statements regarding wrinkling and delamination are literally false. As an example of plaintiff's statements regarding wrinkling and delamination, defendants first cite to an email from Meghan Corradini, a BSN employee, to Texas Health Resources ("THR"), a customer that had switched to PMA:

59

> THR has mandated that all hospitals switch to the Parker splint material. Frank wanted to stay with Ortho-Glass but he had no choice. The contract is only for a year, so we hope to get your business back soon. Ortho-Glass is a wrinkle-free splint material vs. the 7-layer Parker splint, which wrinkles very easily (causing pressure points) and has delamination issues (causing the splint to breakdown). If you experience any issues with Parker product please let THR corporate know.

(Corradini 7:5-22, 72:1-4, 88:16-89:24, DE 250-4, p. 7.) Defendants further contend that plaintiff made similar statements in advertising presentations to other potential customers, including Eastern Pennsylvania Regional Collaborative, SSM Healthcare, and Empire Medical Group, as well as in plaintiff's current product catalog, which advertises Ortho-Glass as using Interlocking Performance Technology ("ILP") that "eliminates the risk of delamination." In the product catalog, at the bottom of the page are two comparison pictures: one showing the substrate of the "new single layer ILP technology" and the other showing the "existing 7-layer technology" used by PMA. The seven-layer substrate is shown as being delaminated. On individual delaminated layers are the words "more delamination," "more layers," "more wrinkles," "more worries." Defendants contend that the comparison is literally false because it necessarily implies that seven-layer splints are, in fact, subject to "delamination," "wrinkles," and "worries," when used as intended. Defendants further contend that the fact that plaintiff's ads did not mention PMA by name does not matter. *See PBM Products, LLC v. Mead Johnson & Co.*, 639 F.3d 111, 117-19, 128 (4th Cir. 2011) (where the plaintiff recovered under the Lanham Act for defendants' false claims about "store brand" product).

According to defendants, at least three BSN employees have admitted that plaintiff's

claims about wrinkling and delamination are false. For instance, plaintiff's Director of

Quality Management and Regulatory Affairs Julio Gonzalez admitted that plaintiff had never

had a customer complaint about delamination or wrinkling of the seven-layer splints it sold

for decades. (Gonzalez Dep. 2 40:1-45:7, Ex. 6, docket no. 236.) Defendants further

contend that Philip Peery, plaintiff's Senior Marketing Manager who conducted tests for

plaintiff on PMA's synthetic products testified that he was not aware of any issues that

PMA's seven-layer products had with delamination or wrinkling. (Perry Dep. 82:2-10;

86:11-24, Ex. 12, docket no. 259.) Peery further testified that Corradini's statements were

neither fair nor true, and that he knew of no tests to support them. (Perry Dep. 86:3-24; 87:2-

5; 87:19-88:4.) Defendants further contend that Corradini herself admitted that her

statements regarding delamination were not true:

> Q: Well, it can happen. But here you said, Parker splint has delamination
> causing the splint to break down. Isn't that what you said?
> A: Yes.
> Q: But that's not true, it is?
> A: No.
> Q: And you don't have anything to support that statement, do you?
> A: No.
> . . . .
> Q: Did you have any information about the specific Parker splint product, that it
> wrinkled easily?
> A: No.
> Q: . . . . Did you have any specific information that the Parker splint product had
> delamination issues?
> A: No.

(Corradini 97:21-98:25; 89:25-90:21; *see also* 97:21-99:15, Ex. 2, docket no. 259.)

Defendants contend that Gary Keytel, plaintiff's Vice President of Sales and Marketing,

61

testified that Corradini learned the information she provided to THR from product training provided by plaintiff BSN. (Keytel Dep. 45:12-21, 46:1-16, Ex. 6, docket no. 259.) Defendants further contend that, as part of its advertising campaign, plaintiff created presentations and training materials for its sales personnel containing false claims about wrinkling and delamination. For instance, plaintiff instructed its sales representatives to discuss wrinkling and delamination issues when competing against seven-layer products like defendant PMA's.

In response to defendants' allegations, and in support of its motion for partial summary judgment, plaintiff contends first that defendants have failed to prove the first prong of their false advertising claim under the Lanham Act–that plaintiff made a statement in a "commercial advertisement." *See Applied Med. Res. Corp. v. Steuer*, 527 F. Supp. 2d 489, 493 (E.D. Va. 2007) (noting that the commercial speech prong is a critical element of a false advertising claim). Courts have adopted a four-part test, known as the *Gordon & Breach* test, for determining whether a statement constitutes "commercial advertising or promotion" for the purpose of a Lanham Act claim.[18] Under the *Gordon & Breach* test:

> in order to qualify as "commercial advertising or promotion," the contested representations must be "(1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services"; and (4) although representations less formal than those made as part of a classic advertising campaign may suffice, they must be disseminated sufficiently to the relevant

---

[18] Although the Fourth Circuit has not expressly adopted the *Gordon & Breach* test, district courts in this circuit routinely apply it. *See Boykin Anchor Co. v. AT&T Corp.*, No. 5:10-CV-591-FL, 2011 WL 1930629, at *4 (E.D.N.C. May 19, 2011) ("[A]s have a number of other courts in this Circuit, this court adopts the *Gordon & Breach* test.").

purchasing public.

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 56 (2d Cir. 2002).

In support of their Lanham Act counterclaim, defendants have identified the following, allegedly false statements: (1) the email from Ms. Corradaini to the Emergency Department Educator at THR; (2) documents used internally by plaintiff to convey information to its own sales force; and (3) power point presentations made to healthcare collaboratives. Plaintiff contends that none of these items constitute commercial speech under the *Gordon & Breach* test.

First, plaintiff contends that Corradini's email does not fit the *Gordon & Breach* definition of "commercial advertising or promotion." That is, her statement was not made for the purpose of influencing THR to purchase plaintiff's products because THR had already decided to purchase PMA's products, based on pricing, when Corradini made her statement. Plaintiff further contends that Corradini made the statement to an educator, not to the individual who would have made the purchasing decision. Finally, plaintiff contends that the statement was not widely disseminated, as this statement was in the form of one email sent to one individual.

Next, with regard to plaintiff BSN's internal presentations and documents regarding sales strategies and other information, plaintiff contends that defendants have not shown that any of these statements were made to a single customer. Plaintiff contends that, in fact, the undisputed testimony is that these documents were not distributed to customers, were for internal use only, and were not disseminated to the purchasing audience at all. Finally, as

63

to the power points that were shared with medical purchasing collaboratives,[19] plaintiff contends that plaintiff's presentation to these entities was for the purpose of negotiating prices, not to make a sale.

Plaintiff next contends that, even if the court concludes that the statements regarding delamination and wrinking were commercial speech, defendants have not shown that these statements were false or misleading. Plaintiff first contends that Corradini's statements were based on her personal observations of seven-layered splinting products. As to the statements in plaintiff's internal documents and the product catalog, plaintiff contends that they could be considered mere puffery, graphics intended to highlight the distinctions between single-layer and seven-layer products. Plaintiff contends that, more significantly, tests conducted by plaintiff have indicated that there *is* more wrinkling and delimination in seven-layer splints than in single-layer ones. Plaintiff contends, furthermore, that the statements were not impliedly false–that is, the statements did not tend to mislead or confuse customers.

The court will deny plaintiff's motion for partial summary judgment as to defendants' false advertising counterclaim under the Lanham Act. The court first finds that at least some of the allegedly false statements constituted commercial speech–including statements made in BSN's product catalog regarding delamination and wrinkling in seven-layer products, as well as statements made by plaintiff's employees and/or sales representatives to potential customers. *See Zeneca Inc. v. Eli Lilly & Co.*, 99 Civ. 1452(JGJ), 1999 WL 509471, at *31

---

[19] Collaboratives are collective bargaining groups that negotiate better prices for their members, but do not, themselves, purchase products.

(S.D.N.Y. July 19, 1999) ("Courts have consistently held that oral statements by a company's sales representative concerning a product constitute 'commercial advertising or promotion' under the Lanham Act.").  Furthermore, the court agrees with defendants that plaintiff's contention that its marketing to customer collaboratives does not constitute commercial advertising is incorrect.  As defendants note, those collaboratives were the relevant purchasing public.  *See Republic Tobacco, L.P. v. N. Atl. Trading Co.*, No. 98C4011, 1999 WL 261712, at *8 (N.D. Ill. Apr. 9, 1999) (finding that allegedly false and misleading statements made to middlemen in the distribution chain were sufficiently disseminated to the purchasing public, noting that "[t]he Lanham Act does not require allegedly false statements to reach the ultimate consumer before they are actionable").  Furthermore, the court finds that there is a genuine issue of fact as to whether plaintiff's statements regarding delamination and wrinkling were literally false.  *See C.B. Fleet Co.*, 131 F.3d at 434 ("Whether an advertisement is literally false is an issue of fact.").  In sum, the court will deny plaintiff's motion for summary judgment as to defendants' Lanham Act counterclaim.

### a.      Defendants' Unfair and Deceptive Trade Practices Counterclaim

For the same reason that the court is denying plaintiff's partial summary judgment motion as to defendants' Lanham Act counterclaim, the court will also deny plaintiff's summary judgment motion as to defendants' unfair and deceptive trade practices counterclaim.  To prove a claim for unfair and deceptive trade practices, defendants must show that plaintiff (1) committed unfair or deceptive acts; (2) in or affecting commerce; (3) that proximately caused injury to defendants.  *Dalton v. Camp*, 353 N.C. 647, 656, 548

65

S.E.2d 704, 711 (2001).  Under North Carolina law, if plaintiff engaged in false advertising under the Lanham Act, then plaintiff will be liable for unfair and deceptive trade practices under N.C. GEN. STAT. § 75-1.1.  *See Ellis v. N. Star Co.*, 326 N.C. 219, 225-26, 388 S.E.2d 127, 131 (1990).  Since the court has found that there is a genuine issue of fact with regard to defendants' Lanham Act counterclaim alleging false advertising, the court will likewise deny plaintiff's summary judgment motion as to defendants' counterclaim for unfair and deceptive trade practices.

The court notes, however, that defendants have not shown that the filing of this lawsuit *itself* constitutes an unfair and deceptive trade practice. The court recognizes that defendants have presented on summary judgment a document referred to as BSN's June 2009 Hospital Business Top Level SWOT Analysis, which lists new Ortho-Glass competitors such as PMA as "Threats."   The document further lists the following as an "opportunity": "Slow/disable new OG competitors through lawsuit." (DE 246-12, pp. 6-7; *see also* DE 246-13, p. 7.) Defendants contend that this document shows that plaintiff filed this lawsuit *solely* to interfere with defendants' business relationships and to slow and disable defendants' business.  Defendants further contend that plaintiff "has used the lawsuit to frustrate PMA's efforts to compete by burying Defendants with endless discovery and motion practice." (Def.'s Br. Opp'n Pl.'s Mot. Summ. J., p. 14, docket no. 258.)  The court finds, however, that plaintiff *did* have at least a reasonable basis for filing this lawsuit.  In other words, the court does not agree with defendants that no reasonable litigant could realistically expect success on the merits.  Thus, to the extent that the unfair and deceptive trade practices claim is based

on the mere fact that plaintiff filed this lawsuit, defendants cannot proceed to trial on this theory.

In sum, for the reasons stated herein, the court will deny plaintiff's motion for partial summary judgment as to defendants' counterclaims.

## IV.    Conclusion

For the reasons stated herein, the court will **DENY** plaintiff's motion to strike Section F of defendants' brief in opposition to plaintiff's motion to strike the Declarations of Hedderman, VanAlstine, and Porter (docket no. 290). The court **GRANTS** defendants' motion to strike the Declarations of Hedderman, VanAlstine, and Porter (docket no. 274). and the court has not considered this evidence in ruling on summary judgment.

The court further **DENIES** in part and **GRANTS** in part defendants' motion for summary judgment (docket no. 234). To this extent, court **GRANTS** defendants' motion for summary judgment as to plaintiff's claims for fraud and copyright infringement. The court **DENIES** defendants' motion for summary judgment as to the remainder of plaintiff's claims. The court **DENIES** plaintiff's motion for partial summary judgment as to defendants' counterclaims (docket no. 248).

**IT IS SO ORDERED**.

Signed: November 17, 2011

Max O. Cogburn Jr.
United States District Judge

67